**Rowdy ADAMS, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–93C.

United States Court of Federal Claims.

Sept. 30, 1999.

Everett L. Bobbitt, San Diego, California, argued for plaintiffs. With him on the briefs was Sanford A. Toyen, San Diego, California.

Agnes M. Brown, U.S. Department of Justice, Washington, D.C., argued for defendant. With her on the briefs were Frank W. Hunger, Assistant Attorney General, and David

M. Cohen, Director, U.S. Department of Justice, Washington, D.C., and Peter Gregory, U.S. Immigration & Naturalization Service, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This overtime pay dispute is before the court after trial limited to the question of liability for a representative sample of plaintiffs. Trial was conducted June 9 through 15, 1999, in San Antonio, Texas and San Diego, California. Post-trial briefing is complete.

## BACKGROUND

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219 (1994), requires an employer, including the federal government, to compensate an employee for overtime work at a rate of at least one-and-one-half times the employee's regular rate of pay. See id. § 207(a). However, "bona fide executive, administrative, or professional" employees are exempt from the FLSA's overtime provisions. Id. § 213(a).

Plaintiffs are, or were, more than 350 "Supervisory Border Patrol Agents" ("SBPAs"), "Supervisory Aircraft Pilots" ("SAPs") and other employees of the U.S. Border Patrol ("Border Patrol") at grades ranging from GS–12 to GS–14. They worked an as-yet-undetermined amount of overtime but were not paid for it under the FLSA. Defendant considers the plaintiffs to be exempt from FLSA overtime pay requirements because they are "executives" as defined by Office of Personnel Management ("OPM") regulations implementing the FLSA. The only issue before the court is whether defendant has established that these plaintiffs fall within the executive exemption.

In order to avoid trying separately the overtime eligibility of each plaintiff, the parties agreed that they would present evidence, and the court would make rulings, as to thirty-one plaintiffs who "as a whole," collectively represent each of the positions implicated in the litigation. It is thus stipulated that the selected plaintiffs "are representative of the plaintiffs in this lawsuit at their respective positions, GS level, and stations." The parties also agreed that "the positions from the stations selected fairly represent the positions throughout the United States Border Patrol." Evidence was presented as to each of the thirty-one representative plaintiffs: sixteen GS–12 SBPAs, nine GS–13 SBPAs, two GS–14 SBPAs, one GS–14 Border Patrol Agent ("BPA"), one GS–13 Aircraft Pilot, one GS–13 SAP, and one GS–14 SAP.[1]

In post-trial briefing, plaintiffs took the position that rulings as to representative plaintiffs controlled similarly graded and classified positions, irrespective of whether a plaintiff's particular job title and description might be completely different. For example, plaintiffs contend that two previously designated representative plaintiffs, Paul Beeson and Loren Nichols, should benefit from whatever ruling the court makes as to GS–13 or GS–14 Supervisory Border Patrol Agents, despite the facts that these two men elected not to testify and that their positions are completely different from those of other plaintiffs of similar grade. The court cannot agree. The court cannot construe the stipulation in a way that is inconsistent with law or reason. It will rule on all representative plaintiffs and expects the parties to apply those rulings consistently to all similarly graded positions with the same organizational job titles.

For example, most of the positions at issue here have the official title of "superviso-

---

1. Only seventeen of these representative plaintiffs testified. Discovery responses were admitted for fourteen of these testifying plaintiffs, and for two non-testifying plaintiffs, Paul Beeson and Loren Nichols. Position descriptions were admitted for all representative plaintiffs. The only evidence in the record for the twelve non-testifying representative plaintiffs (other than Beeson and Nichols) are their position descriptions. The court is able, nevertheless, to rule as to these representative plaintiffs because the parties agreed that these plaintiffs' circumstances are adequately represented by testifying plaintiffs occupying the same positions. In other words, the evidence in the record is sufficient for the court to make findings with respect to each of the positions stipulated by the parties to require a ruling.

ry border patrol agent." Yet within that classification, agents hold a wide variety of positions, which are identified by specific organizational titles on an agent's position description ("PD"). For purposes of this opinion, the court will use the term "SBPA" to refer to only supervisory border patrol agents who are first-line supervisors to BPAs, i.e., the lowest level supervisors within the agency. These are the only agents whose organizational title is "supervisory border patrol agent." Explaining the various positions held by the representative plaintiffs is more easily done in the context of a more general description of the Border Patrol organizational structure.

The Border Patrol is headquartered in Washington, DC. Its function is to enforce the nation's laws with respect to entry from foreign countries. The agency's field structure is built around three geographic regions, each with a regional headquarters. None of the representative plaintiffs are employed at regional headquarters.

Collectively, the regions are divided into twenty one sectors, each with its own sector headquarters. Sector headquarters are under the control of a Chief Patrol Agent ("CPA"). Immediately below the CPA is the Deputy CPA, followed by one or more Assistant CPAs.

Each sector encompasses a number of border patrol stations. Stations are headed by Patrol Agent in Charge ("PAIC"), who typically reports to one of the Assistant CPAs. Structure in the different sectors and stations varies to some extent, primarily dependent on size, but in most stations there are also one or more Assistant Patrol Agents in Charge ("APAICs"). In the larger stations, the field position below the APAIC is that of Field Operations Supervisor ("FOS") sometimes referred to as a "Watch Commander."

Below the FOSs (there is typically more than one FOS in a station) is the position of SBPA. The SBPAs, in turn, supervise the BPAs.

Although the organization of each station is to some extent unique, the supervisory pyramid described by Sherry Feltner, PAIC at Temicula Station in southern California, is a useful paradigm. She referred to herself as a fourth-line supervisor (of BPAs). Below her is the APAIC, who is a third-line supervisor. Below the APAIC are three FOSs. Below the FOSs are fifteen SBPAs, who are the first-line supervisors of the approximately 125 BPAs.

Depending on the size of the sector or station within which an agent works, a particular position can appear at a number of GS pay levels. For example, in the larger stations, the PAIC is typically a GS–14. In the smaller stations, the PAIC can be a GS–13 or even a GS–12. In some positions, there is considerably less variance. FOSs are typically at a GS–13 level; SBPAs are generally graded either GS–11 or GS–12.[2]

The court heard testimony from nineteen plaintiffs (including seventeen representative plaintiffs),[3] thirteen in San Antonio and six in San Diego. In addition, defendant presented the testimony of twelve other witnesses, including the Deputy Chief of the Border Patrol, Michael Nicley.

## DISCUSSION

In the case of most federal employees, including plaintiffs, the FLSA is administered by OPM. See 29 U.S.C. §§ 204(f), 213(a) (1994). At the time the suit was filed in 1996, the applicable OPM regulation[4] defined an executive employee as a

2. The parties stipulated that GS–11 SBPA positions are merely probationary GS–12 positions. In other words, once a BPA is promoted to an SBPA, he or she remains a GS–11 for a probationary period. Once that period expires, he or she becomes a GS–12. The supervisory responsibilities of GS–11 and GS–12 SBPAs are thus identical. The parties stipulated that the court's ruling with respect to GS–12 SBPAs would also apply to GS–11 SBPAs.

3. The two non-representative plaintiffs were Gerald Kern and Michael Hance. Mr. Kern testified in San Antonio; Mr. Hance testified in San Diego.

4. In an earlier opinion, the court ruled that OPM's regulations, which, unlike Department of Labor regulations, do not contain a "salary-basis" test, are applicable. See Adams v. United States, 40 Fed.Cl. 303 (1998).

supervisor, foreman, or manager who manages a Federal agency or any subdivision thereof (including the lowest recognized organizational unit with a continuing function) and regularly and customarily directs the work of at least three subordinate employees (excluding support employees) and meets all the following criteria:

(a) The employee's primary duty consists of management or supervision. The primary duty requirement is met if the employee—

(1) Has authority to select or remove, and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and

(2) Customarily and regularly exercises discretion and independent judgment in such activities as work planning and organization; work assignment, direction, review, and evaluation; and other aspects of management of subordinates, including personnel administration.

5 C.F.R. § 551.204 (1997).[5]

 In applying this test, the plaintiffs are not presumed to be exempt. Rather, the government has the burden of proving entitlement to an FLSA exemption. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Berg v. Newman*, 982 F.2d 500, 503 (Fed.Cir. 1992); 5 C.F.R. § 551.202(c) (1999). Moreover, "[e]xemption criteria must be narrowly construed to apply to only those employees who are clearly within the terms and spirit of the exemption." 5 C.F.R. § 551.202(b); *see also Baca v. United States*, 29 Fed.Cl. 354, 359 (1993).

This test can be distilled into three general components, insofar as the issues litigated here are concerned. The plaintiffs have to supervise at least the requisite number of employees; they have to manage or super-

vise at least the lowest recognized organizational unit within the Border Patrol; and they have to meet the primary duty test. As the government has argued only the executive exemption, if any particular employee does not meet one element of this test, it is unnecessary to determine if they meet the others. Failing to meet each of these elements is fatal to the government's claim of exemption. Consequently, as the exemption of individuals or classifications founder on any point, they are dropped from the discussion.

*Number of Employees Supervised*

Up until December 23, 1997, it was necessary for an exempt employee to supervise three non-support employees. After that date, the test was lowered to two employees of any type. Although most of the plaintiffs who testified supervise more than three employees, a few do, or did, not.

 Larry Caver, now retired, was a GS–14 BPA. He was stationed in the El Paso Sector and was tasked with liaison to the Department of Defense. Caver's PD states that the work is neither managerial or supervisory. He only supervised one employee, a clerk-typist. Consequently, he does not meet the executive exemption criteria and is eligible for overtime pay.

Jerry Lasher is a GS–13 Aircraft Pilot. He is the Assistant Chief of the Air Operations Center, which is located in El Paso. He has no unit responsibilities and does not supervise BPAs. He testified that he supervises six people but only two of them are non-support staff: a GS–12 equipment specialist, and a WG–12 aircraft mechanic. The others are an administrative aide and three part-time student aides. In his interrogatory responses, however, Lasher states that from January 29, 1989 to the date of his response (January 28, 1997), he supervised three GS–12 Flight Instructors, an accounting technician, and a student aide. *See* Def.'s Ex. 44, Interrog. Resp. 4e.

---

**5.** This regulation was changed in material ways and renumbered as § 551.205 at the end of 1997. The number of employees supervised was lowered to two, and the requirement that those subordinates not be support staff was dropped. *See* 5 C.F.R. § 551.205 (1999). In addition, a definition for "primary duty" has been added which creates a presumption that a job which is less than 50% supervisory in nature does not meet the test. The presumption can be overcome if three additional criteria are met. *See id.* § 551.104; *see also* discussion *infra* at 779–780.

This apparent contradiction was not explored at trial. The only obvious reconciliation is that at some point after January 28, 1997, Lasher ceased supervising three Flight Instructors and started supervising two people with somewhat different job descriptions. At least until January 28, 1997, Lasher supervised three non-support staff employees. After December 23, 1997, when the test changed, Lasher would have met the minimum requirements in terms of persons supervised even if he only supervised four support staff. Considering the continuing obligation of a witness to update interrogatory answers to correct mis-impressions, the court will assume that the change in Lasher's duties is more recent. There is no point, in other words, at which Lasher did not supervise the minimum required number of persons. Whether he meets the other elements of the executive exemption will be considered below.

Royce Johnston is currently an Assistant CPA at the Grand Forks Sector headquarters. He took on that position in August 1998. Prior to that time, he was the PAIC at the Portal, North Dakota station. From April 1997 until August 1998 he supervised only two employees. In other words, from April 1997 until December 23, 1997, he is eligible for overtime pay irrespective of the outcome of the other elements of the test. For the remainder of the time he served as a PAIC, he supervised at least three non-support employees.

As to the balance of the representative plaintiffs, even those who did not testify, all supervised three or more non-support employees.[6]

*Recognized Organizational Unit*

■ OPM issued an advisory letter, FPM Letter 551–7, in 1975. In it, the agency defines a recognized organizational unit as

An established and defined organizational entity with regularly assigned employees. This requirement distinguishes supervisors who are responsible for planning and accomplishing a continuing workload from

"leaders" who head temporary groups formed to perform a special assignment of limited duration, or who direct the work of other employees assigned to a project but do not exercise full supervision over such employees. Leaders of this nature do not qualify for exemption as executive employees.

FPM Letter 551–7 § B(1)(b).

Defendant refers to this letter in both its pre and post-trial briefing. At the close of trial, however, defendant's counsel advised the court that it was no longer in effect. Apparently this was true after December 31, 1994. *See* FPM Sunset Document at 73 (Dec. 31, 1993). During most of the three-year limitations period here, it was not in existence. Moreover, the letter merely characterized itself as general guidance. *See* FPM Letter 551–7 at 1. Relevant portions of the letter were resurrected, however, and given additional gravitas by being officially adopted as regulations at the end of 1997. *See* 62 Fed.Reg. 67,238, 67,238, 67,246 (Dec. 23, 1997) (codified in 5 C.F.R. § 551.104 (1999)). Specifically re-adopted were the test for a "recognized organizational unit," and a definition of "primary duty" which creates a presumption that such a duty must constitute over fifty percent of an employee's work. *See* 5 C.F.R. § 551.104 (1999).

The court will apply the current regulatory definitions of primary duty and organizational unit as if they have been in place throughout the relevant period. Whether the definitions are advisory or codified, they are a reasonable interpretation of the statutory language. And, in any event, they permit a certain degree of flexibility.

Plaintiffs argue that the lowest organizational unit is the station. And plainly the station is a unit within the meaning of the regulation. *See, e.g., West v. Anne Arundel County,* 137 F.3d 752, 763 (4th Cir.1998) (fire station is a unit); *Quirk v. Baltimore County,* 895 F.Supp. 773, 787 (D.Md.1995) (same); *Masters v. City of Huntington,* 800 F.Supp.

---

6. Gerald Kern testified, although he was not a representative plaintiff. He retired at the end of 1995 at a time when he was GS–11 PAIC at the Colville, Washington, station. For the time embraced within the limitations period, he supervised fewer than three employees, and thus was not exempt from overtime coverage.

363, 366 (S.D.W.Va.1992) (same); *Hartman v. Arlington County,* 720 F.Supp. 1227, 1229 (E.D.Va.1989), *aff'd,* 903 F.2d 290 (4th Cir. 1990) (same). The question is whether some assemblage below the station is a unit as well. Prior to and during trial, defendant maintained that an SBPA and the BPAs assigned to him administratively constituted the lowest recognized organizational unit within the Border Patrol, although it could not offer a name for this group. At the close of trial, the court indicated its preliminary disagreement with defendant's view and asked for post-trial briefing focused on whether the shift was the lowest recognized organizational unit. In its post-trial briefing, the government writes that "the lowest recognized organizational unit with a continuing function is a shift of border patrol agents, and the FOS or Watch Commander is the official who is responsible for supervising or managing the shift." Def.'s Br. at 9. It is not clear to the court whether defendant now concedes that SBPAs do not supervise a recognized organizational unit smaller than a shift. If so, then those positions cannot be exempt, even if the incumbents perform executive functions. In any event, an examination of the role of SBPAs and the way the Border Patrol is organized demonstrates that a shift within a border patrol station is the lowest ongoing organizational unit.

Both FOSs and SBPAs perform two types of supervisory function. They supervise lower level employees in terms of personnel administration; in the case of FOSs, they have first-line responsibility for personnel administration for one or more of the SBPAs. Each of the SBPAs, in turn, is assigned six to eight BPAs by the FOSs at the beginning of the year, for personnel administration purposes. They are thus responsible for time and attendance, within-grade step-increase ("WGSI") recommendations, and performance evaluation for a specific group of employees. As second-line supervisors, the FOSs must review the annual appraisals of BPAs, along with any other recommendations for advancement or bonuses originating with the SBPAs.

The locus for personnel administration and work scheduling is the station office. The station office is the administrative center of the station, where most paperwork takes place, assemblies are held, equipment is maintained and where communications with the field is centered.

The real work of the BPAs, SBPAs, and FOSs takes place in the field, however, and that is where the second aspect of supervisory responsibility of the SBPAs and FOSs is reflected.[7] Work in the field is typically organized around one of the three eight-hour shifts. Each shift is under the direction of one or more FOSs or Watch Commanders. They share responsibility for the entire shift. Typically, each shift also has several SBPAs. The SBPAs, as indicated above, have been assigned a group of six to eight BPAs for administrative purposes, but not necessarily for field supervision. If an SBPA is rotated to a different assignment, the BPAs under him are generally not reassigned.

The assignment of BPAs to SBPAs for field duty on any particular day is a reflection of two variables: who is scheduled to work on a that day (work takes place seven days a week but most employees work only five days a week), and which BPA is assigned to which SBPA for that day's work. Both phenomena are a result of the fact that the SBPAs and BPAs for which they are administratively responsible have independent leave schedules.

FOSs in the larger stations swap the duty of planning the personnel assignments for their shifts for particular days. In smaller stations FOSs do their own shift planning. The smallest stations have no FOSs and the shift planning is done by the PAIC or the supervisors.

Shift assignments are posted in advance, showing which BPA is working what day and with which supervisor. At the beginning of a shift, an assembly is held during which typically an FOS assigns particular duty areas to particular SBPAs, and thus to the BPAs assigned to that supervisor for that shift.

---

7. As explained below, the court rejects plaintiffs' argument that field supervision does not satisfy the primary duty test of the executive exemption.

Once in the field, the SBPAs are in charge of the group of agents assigned to them for that day. The group of BPAs assigned to an SBPA typically varies from day to day and is not determined by which BPAs are assigned to the SBPA for administrative purposes. The two supervisory functions of the SBPAs—field supervision and personnel administration—are thus separately administered.

The government offered no official name for this group of agents plus supervisor. Some witnesses referred to it as a unit, others as a team. Jose Garza, CPA of the McAllen Sector in Texas, a witness for the government, could not offer a name for this group of employees other than "unit." Tr. at 404. It is plain enough that it has no permanence in terms of field assignment. It is not the same as the group of agents assigned to a particular supervisor for purposes of personnel administration. Although there was testimony that some sectors attempt to keep agents with the same supervisor for both field and personnel supervision purposes, the court is persuaded that this is no more than a feeble ambition. It is not accomplished in fact. As Isaac Garcia, a GS–12 SBPA in El Paso, testified, the supervisor supervises whichever agents happen to be on duty that day. This was confirmed by Chief Garza, who explained that the BPAs assigned for supervisory purposes to one agent could report to another agent in the field, although not on any consistent basis. He even referred to shifts as the relevant "unit" on one occasion in his testimony. Tr. at 582.

The group of persons assigned to an SBPA for purposes of field supervision does not, therefore, meet the requirement of a "recognized organizational unit with a continuing function." The assemblage of BPAs assigned to a particular SBPA on any day's shift cannot be referred to in any way that lasts beyond that day. It has no continuing identity.[8]

The shift, however, is another matter. Shifts typically are established on a six-monthly or annual basis, and, with minor exceptions, continue intact until the end of that period with the same supervisors and agents. A particular shift can be referred to readily enough for administrative purposes, as for example, the "midnight to eight a.m. shift." In the Yuma, Arizona, Station, the three shifts are given alphabetical designations. Moreover, two FOSs, Joseph Rayball Jr.[9] and Robert Argento, a Government witness, identified the shift as the lowest organizational unit within a station. See Tr. at 832, 1009–10. In addition, the shift has a continuing function, namely, carrying out border patrol functions in the geographic area assigned to a station during a set period of time.

---

8. In contrast, courts have held, in other contexts, that a recognized organizational unit exists for units below the station level where there is evidence of some permanency. See *Quirk*, 895 F.Supp. at 788 (noting that EMS units have a "permanent status and function"); cf. *West*, 137 F.3d at 763 (holding that EMS field lieutenants are exempt); *Auer v. Robbins*, 65 F.3d 702, 714–19 (8th Cir.1995) (holding that police sergeants supervising discrete units of 6–10 officers are exempt), aff'd, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Shockley v. City of Newport News*, 997 F.2d 18, 25–26 (4th Cir.1993) (holding that police sergeants supervising specialized units are exempt).

The court notes that three witnesses—Ronald Sanders, CPA of the Tucson Sector in Arizona, Donald McDermott, an FOS at the Brown Field station in the San Diego Sector, and Joseph Rayball, Jr., an FOS at the Chula Vista station in California—indicated that there are special purpose units, consisting of a single SBPA and a handful of BPAs. Sanders identified a number of specialized units, including a bicycle patrol unit, a horse patrol unit, and a ranch patrol unit. See Tr. at 856–59. McDermott referred to horse patrol and intelligence units in his sector. See id. at 768. Rayball testified that he supervised a Special Operations Unit. See id. at 824, 827–28. Arguably, these units, unlike the standard units of BPAs, have regularly-assigned agents and could meet the organizational unit test. Cf. *Auer*, 65 F.3d at 714–19 (holding that police sergeants supervising specialized units, including horse patrol and intelligence units, were exempt); *Shockley*, 997 F.2d at 26–27 (holding that police sergeants supervising specialized units were exempt). The government has not argued, however, that these supervisors should be treated separately from other SBPAs. In any event, the court was given insufficient evidence to draw any firm conclusions as to their organization or duration.

9. Mr. Rayball was designated as a representative plaintiff for the GS–12 SBPA position. He was subsequently promoted to a GS–13 FOS position.

For those station with FOSs, typically three are employed, one per shift. Each is responsible for the scheduling and administrative supervisory duties for their shift. At the largest stations, where there are more than three FOSs at a station, there are occasions when more than one FOS works on a shift. In these circumstances, either one FOS may supervise the line units and one supervises special operations, or field command of the shift may be shared by the FOSs. In addition, the FOSs share scheduling duties. For rating purposes, however, they are each assigned specific SBPAs. Unlike the situation with respect to SBPAs and the agents assigned to them, rotation of the FOSs *within the shift* does not alter the continued existence and identity and function of the shift as a unit. Although a different FOS may be in charge in the field on Monday than on Tuesday, those two FOSs are still supervising the same unit of agents.

The court concludes that FOSs supervise a recognized organizational unit. *Cf., e.g., West*, 137 F.3d at 763 (holding that a shift is a recognized unit of a fire department); *Masters*, 800 F.Supp. at 364–65; *International Ass'n of Fire Fighters v. City of Alexandria*, 720 F.Supp. 1230, 1233 (E.D.Va. 1989), *aff'd*, 912 F.2d 463 (4th Cir.1990) (table).

Plaintiffs conceded during trial that the station is a recognized organizational unit with a continuing function. It follows, then, that APAICs and PAICs meet this element of the test. Similarly, supervisors within the sector command structure, which supervises multiple stations, qualify as well. In other words, only the SBPAs who function as first-line supervisors of BPAs fail the organizational unit test.

*Remaining plaintiffs*

■ The organizational unit test must be applied as well with respect to two other groups of representational employees, those

at the Border Patrol Academy, Federal Law Enforcement Training Center in Glynco, Georgia (the "Academy"), and the Air Operations Center in El Paso, Texas. Only one of the representational plaintiffs works at the Academy, Paul Beeson. Although he was listed as a witness for the San Antonio phase of the trial, he did not testify. The court thus only has his position description and his discovery responses [10] on which to base a ruling. It is sufficient, however, to sustain the government's burden of proof on this issue.

Beeson is the Assistant Chief of the Academy. He is the first-line supervisor for the instructional staff, and for supervisory agents detailed to the Academy as instructors. He is responsible for planning and carrying out the instructional program for both trainers and trainees. In that process he supervises and evaluates the staff, develops courses, and assists higher level supervisors in their duties. From his position description it becomes apparent that, the instructional staff constitute an organizational unit, and that his supervisory role is exercised with respect to that unit, and in an executive capacity. *Cf. Auer*, 65 F.3d at 717 (holding that police sergeants who supervise training at a police academy are exempt).

The remaining employees are pilots. Loren Nichols, and Jerry Lasher are at the Border Patrol's Air Operations Center, where Nichols is Deputy Chief and Lasher is one of the Assistant Chiefs. Thomas Maxwell is a PAIC at the Laredo Sector headquarters, where he runs the sector's air operations. Maxwell and Lasher testified; Nichols did not. The court is satisfied that they all supervise units within the contemplation of the regulation.

There is no question from the position descriptions of Nichols and Lasher that the Air Operations Center is an organizational unit with a continuing function. The Center

---

10. After trial, the court directed that his discovery responses, along with those of Loren Nichols, be included in the trial record. They had been previously listed as defendant exhibits but were not included in the trial record as Beeson and Nichols did not testify. Plaintiffs object to this supplementation of the record. It is not clear to the court why. There was no objection at pre-

trial as to their authenticity and they are under oath. The reason they were not included initially is that they did not appear, despite their designation as witnesses. They remain representative parties, however, and the court sees no alternative to a more informed ruling but to inclusion of what evidence it has available.

"directs, coordinates, and controls the execution of all Air Operations Programs ... for all Border Patrol Sectors and INS Regions." Def.'s Ex. 54 at 2. These programs include the training of pilots and aircraft mechanics, aircraft accident investigations, aircraft maintenance, and aircraft and parts acquisitions. The Center is thus a recognized organizational unit, managed by the Chief of Air Operations, and in his or her absence, by the Deputy Chief, Nichols.

Lasher is one of three Assistant Chiefs. He testified that he has no unit responsibilities, and there was no cross-examination on that point. This testimony, however, is apparently inconsistent with his interrogatory answers, in which he states that he supervised three flight instructors. This latter is consistent with his position description, which reflects that he "[s]erves as first line supervisor to staff engaged in ... training functions for the air operations program." Def.'s Ex. 43 at 2. The court will take at face value all his sworn statements. The only way to reconcile them, as explained above, is to conclude that he supervised a unit of trainers from at least 1989 until shortly before the date of trial. There is no reason to think that a group of flight instructors, support staff, and a supervisor are not an organizational unit with a continuing function, particularly when there is only one national Air Operations Center in the Border Patrol.

Nichols is the first-line supervisor of three Assistant Chiefs (including Lasher). A comparison of Nichols' and Lasher's position descriptions suggests that Nichols is also a second-line supervisor to at least Lasher's training unit. Because we have held that Lasher supervises a recognized organizational unit, we conclude also that Nichols too meets this aspect of the executive exemption.

Thomas Maxwell is a PAIC, in charge of air operations for the Laredo Sector. He supervises five pilots who conduct all air activities in that sector. He is under the direct supervision of the Laredo Assistant CPA. From his testimony, it is obvious that he runs the air operations as a single unit which has a continuing function in much the same way as a PAIC supervises a single station within the sector. The court concludes that the "unit" test is also met with respect to this position.

*The Primary Duty Test* [11]

With respect to agents classified at GS–11 or higher, the test is limited to whether the employee's primary duty "consists of management or supervision." The primary duty test is met if the employee—

(1) Has authority to select or remove, and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and

(2) Customarily and regularly exercises discretion and independent judgment in such activities and work planning and organization; work assignment, direction, review and evaluation; and other aspects of management of subordinates, including personnel administration.

5 C.F.R. § 551.204 (1997).

On December 23, 1997, the test was clarified to specify that a primary duty is one which requires that the supervisory aspects of a job either engage more than fifty per-

---

**11.** The representative plaintiffs' job descriptions are in evidence. Also in evidence are interrogatory answers from most of the representative plaintiffs indicating that these descriptions are "fair and accurate." Several of the SBPAs testified that the PDs are nonetheless inaccurate, either in terms of what they do, or in terms of the amount of time devoted to particular supervisory functions. As the court indicated at the time it denied the government's motion for summary judgment, it was willing to hear evidence contradicting the PDs, notwithstanding their apparent endorsement in answers to interrogatories. It was further obvious at trial that the witnesses, who the court generally found credible, should not have been bound by their apparent endorsements of the PDs. They assumed, albeit unjustifiably, that the question being put to them in the interrogatories was whether the job descriptions were "fairly accurate." The court believes them, although their imprecision undoubtedly added confusion to the government's understanding of plaintiffs' position. In any event, most merely took issue with the allocations of time between supervisory and non-supervisory duties, and generally agreed that they perform the duties indicated.

cent of the work time, or that three other criteria be met: (1) the work must be a substantial, regular part of the duties of the position; (2) the supervisory aspects must govern the classification and qualification requirements; (3) the basic nature of the work must be executive or supervisory in terms of the frequency with which independent judgment and discretion are exercised. *See* 62 Fed.Reg. at 67,246 (codified at 5 C.F.R. § 551.104 (1999)).

Although the court is persuaded that the work of the SBPAs probably meets the primary duty test,[12] it is unnecessary to make any findings in that regard, as SBPAs do not meet the "lowest recognized organizational unit" test.

With respect to the remaining positions, certain arguments were made repeatedly by plaintiffs in different grades. One is that they did not meet that part of the first element of the primary duty test which looks for a duty of "selecting, removing, advancing in pay, or promoting subordinate employees." 5 C.F.R. § 551.205(a)(1) (1999). Plaintiffs are correct with respect to virtually all representative plaintiffs.[13] The authority to initiate discipline rests with the deputy chief of a sector, who acts as a proposing official. The chief of the sector acts as deciding official. In addition, hiring and firing decisions are not made by any of the representative plaintiffs. Nor can they promote subordinates. Those decisions are made at the sector level. The government's only hope of meeting the first part of the primary duty test for the majority of plaintiffs is if plaintiffs have authority to "suggest or recommend" comparable actions, "with particular consideration given to these suggestions." *Id.* The court concludes that they do.

The SBPAs supervised by FOSs, as well as the FOSs themselves, are entitled, under appropriate circumstances, to routine WGSIs (awarded based on years of satisfactory service), Quality Step Increases ("QSIs") (awarded for especially meritorious service),

or cash bonuses (likewise awarded for meritorious service). The role of lower-level first-line supervisors in this process is, admittedly, not that of decision-maker. But FOSs, for example, are essential in the process of evaluating SBPAs in that they, as first-line supervisors, have to initiate these administrative actions and certify that the subordinate warrants the requested pay adjustment. The fact that they routinely certify their subordinates as performing sufficiently satisfactorily to receive WGSIs, or that they rarely recommend QSIs or cash bonuses, does not detract from their authority to do so. As Chief Garza testified, FOSs have the right to deny a step increase, presumably by issuing an unfavorable appraisal. In addition, as a practical matter, they can initiate factual reports which are understood to lead to the possibility of initiation of discipline proposals by the Deputy CPA. They all participate in Officer Corps Rating System ("OCORS") evaluations.[14] APAIC San Juanita Luna, a government witness, testified that SBPAs can issue verbal reprimands and can recommend cash bonuses. Although promotion decisions are made centrally by the chief of the sector, they are made with input from the PAICs, in part drawn from subordinate supervisors.

The FOS and higher positions thus have a sufficient degree of responsibility with respect to personnel actions and therefore meet the first half of the primary duty test. The second half of the test, along with the "quantum" consideration now included in the definition of primary duty, will be applied to each of the positions litigated.

The first to be considered is that of the FOS or Watch Commander. The court is satisfied that the work of the FOS is "executive" within the meaning of the statute.

The FOS plaintiffs concede that the entirety of their administrative duties and a portion of their field time is supervisory. They contend, however, that the majority of their field time—and more than fifty percent of

---

12. *Cf. Auer,* 65 F.3d at 714–19; *Shockley,* 997 F.2d at 25–26; *Quirk,* 895 F.Supp. at 786–87.

13. One representative plaintiff, Robert Finley, is the Deputy Chief of the Grand Forks Sector.

14. This rating system is used to evaluate lower-level BPAs seeking promotion to higher, non-supervisory positions.

their overall duties—is spent performing non-supervisory duties that are performed by BPAs—patrolling the border, arresting illegal aliens, conducting checkpoints, etc. In other words, they are only engaged in supervisory work in the field when they are directly giving orders to their subordinates—the passive monitoring and oversight of their subordinates in the field is not "real" supervision for purposes of the statute. The court disagrees.

FOSs are, for all practical purposes, completely in charge of operations in the field, with significant room for exercise of independent judgment in enforcing the Border Patrol's statutory mandate. They can reassign SBPAs and their associated agents from one area within the station's field of operation to another. They can direct emergency response. They can order agents and their supervisors to perform, or cease performing, any task. They can move SBPAs and agents from one area to another. They can orally reprimand subordinates for poor work. They can authorize or order the cessation of high-speed pursuit of suspects. Even though FOSs can operate like their subordinates in terms of making arrests, manning checkpoints, pursuing suspects, etc., and can operate much as an SBPA, their real function in the field is at all times to be aware of who is doing what, where, and being prepared to make decisions about reallocation of resources within the entire station.[15]

In addition, FOSs have the primary responsibility of assigning work to the SBPAs and BPAs. Also, they can be asked to fill in for the PAIC in his absence. Those field and station office supervisory functions plainly meet most of the requirements of the second half of the primary duty test, namely, engaging in the "exercise[ ] of discretion and independent judgment in . . . work planning and organization; work assignment, direction, review, and evaluation." 5 C.F.R. § 551.205(a)(2) (1999); *see Masters*, 800 F.Supp. at 365; *see also Adams v. United States*, 36 Fed.Cl. 91, 99 (1996). This conclusion is not affected by the fact that they perform the same tasks as their subordinates for the majority of the time that they are in the field. *See Auer*, 65 F.3d at 714, 715; *Shockley*, 997 F.2d at 27; *Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (1st Cir.1982); *Masters*, 800 F.Supp. at 365, 366; *Hartman*, 720 F.Supp. at 1228–29.

Other components of the second half of the primary duty test—"evaluation, and other aspects of management of subordinates, including personnel administration"—are satisfied by the administrative aspects of the FOSs' work. FOSs can grant unscheduled leave. They can order overtime. In addition, FOSs have a necessary role to play in their subordinates obtaining WIGIs. In doing the annual performance appraisals for the SBPAs, the FOSs have to evaluate their performance and indicate whether it is satisfactory.[16] Although the court believes the consistent testimony of the FOSs and the SBPAs that unsatisfactory ratings are frowned upon, the fact remains that the supervisors have a role to play. *See Shockley*, 997 F.2d at 26. An FOS can recommend an SBPA for a QSI.[17] Although discipline can only be initiated formally by the APAIC, the FOS, like the SBPA, can make fact findings that are the prerequisite to the APAIC initiating discipline. FOSs review Performance Work Plans drafted by SBPAs for their subordinates.

Nor is the primary duty of an FOS diluted by the fact that the FOSs in some larger stations may share field supervisory responsibilities during the same shift. In those stations, the FOSs, in effect, co-manage the shift simultaneously. They are each fully responsible for the entire shift.

---

**15.** The court notes that two supervisors, Joseph Rayball, Jr., a representative plaintiff, and Robert Argento, testified that they are acting as supervisors the entire time they are in the field. This characterization was endorsed by Jerry Armstrong, Deputy CPA of the El Paso Sector.

**16.** As with other personnel functions, several witnesses testified that they did not feel the liberty to exercise the power to rate a subordinate as un-

satisfactory. Several of the supervisors, however, such as SBPAs Luis Pedregon and Royce Johnston, recognized that they in fact had this authority.

**17.** Although this may not occur frequently, the fact that it does occur suggests that it is in fact an option.

FOSs, therefore, fully satisfy the primary duty test, whether as articulated before or after the 1997 amendment. Moreover, even if their characterization of the percentages of supervisory time is accurate, the court finds that the basic nature of their work is supervisory and governs their job classification, and that their supervision is a substantial, regular part of their positions. *See Shockley,* 997 F.2d at 27; *Masters,* 800 F.Supp. at 366.

It follows from what has been said about the FOS position, both in terms of the lowest organizational unit and the nature of the job, that PAIC and APAIC positions are also exempt. Both positions have all the powers of the FOS, plus additional ones. They are responsible not only for all the shifts, but for the entire station, which even plaintiffs concede is an organizational unit with a continuing function.

It is true that, in the smallest stations, very little time is spent in the station office by even the PAIC. As Frank Kopczynski, former PAIC in Niagara Falls, New York, testified, he basically does the work of his agents in the field. Unlike most PAICs in larger offices, he had few agents and had to spend seven of ten hours performing basic agent work in the field. It is also true that in the larger stations, there is substantially more paperwork involved in assigning agents to shifts and supervisors and in maintaining the station office.

Nicholas Fisher is PAIC in the Port Huron, Michigan station. This is also a smaller station, without a FOS. He, like agent Kopczynski, spent much of his time in the field and felt he had no authority to discipline. His role on hiring boards and in OCORS evaluations was, he felt, perfunctory.

Nevertheless, even agent Kopczynski testified that he evaluated all his agents, was responsible for station operation, made work assignments, scheduled duty hours, and could deny annual leave and recommend QSIs. Similarly, Fisher testified that he assigns work and sets up shifts for his station. He has the discretion to redirect work, to grant or deny leave and to order overtime. He could "write up" people for infractions.

In short, although the press of work might make it difficult for PAICs in smaller stations to avoid agent work, their supervisory role and activities are the defining elements of their position. Their station management functions—assigning work, scheduling hours, handling the administrative paperflow—are not episodic or incidental. These activities called for substantial discretion and effectively defined the role. As Gary Witt, formerly the PAIC in Detroit, testified, "I was expected to run my station." Tr. at 670.

Even as to the PAIC position in a small station, in other words, the court finds that the primary duty test is met. The PAICs in the larger stations perforce have even less basis for arguing that their positions are not primarily supervisory in nature.

No APAIC representative plaintiffs testified, although the PD of one, Ronald Colburn, of the Nogales, Arizona station, is in the record. Moreover we have the testimony of several supervisors, including Ms. Luna, APAIC at the Mercedes station, in the McAllen, Texas Sector, and a former APAIC, Steven Kean. They testified that an APAIC's role is to assist the PAIC in supervising the station, usually handling the administrative and personnel aspects of the work and freeing up the PAIC for more operational activities. The APAIC stands in for the PAIC when necessary. If the station has FOSs, the APAIC is the first-line supervisor of the FOSs, second-line supervisor of the SBPAs, and third-line supervisor of the BPAs. If there are no FOSs, the APAIC is the first-line supervisor to the SBPAs and a second-line supervisor to the BPAs. Colburn's PD is consistent with that testimony. The court concludes that APAICs satisfy the primary duty test.

Above the PAICs in the Border Patrol management pyramid are, in ascending order, the Assistant CPA, to whom the PAICs report, and who reports to the next person up the chain, the Deputy CPA. The Deputy CPA, in turn reports to the CPA. Plainly these are exempt positions, as each has increasingly greater supervisory responsibility beyond the station level. *See Aamold v. United States,* 39 Fed.Cl. 735, 742 n. 10 (1997). The Assistant CPA has supervisory

responsibility for specific stations within the sector. The Deputy CPA is the de facto executive officer to the CPA and stands in for the CPA when necessary. The Deputy CPA acts as the proposing official for disciplinary actions.

Other, specialized positions must be considered. The first is that of Jerry Lasher, a GS–13 Supervisory Aircraft Pilot. His organizational title is Assistant Chief, Air Operations. His job description states that he serves as "one of the three principal advisors in the direction, planning, coordination, control and execution of all Border Patrol air operations functions." Def.'s Ex. 43 at 2. Air operations is considered one of the "major program functions" of the Border Patrol's air operations. *Id.* at 2. Lasher only had minor quibbles with his position description. He conceded that, in addition to collaboration with management in terms of policy development and implementation, he serves as first-line supervisor to staff engaged in maintenance, supply, and training functions for the air operations program. He plans work, assigns tasks, and provides instruction to his subordinates. He resolves their complaints, or refers more serious grievances to his superior. These management and supervisory functions take, according to his estimate, seventy percent of his time. Flying is a relatively minor duty, taking only five percent of his time. He disagreed with his PD in that he cannot actually recommend disciplinary action of his subordinates and he does not make decisions on behalf of air operations. He does stand in for the Chief or Deputy Chief of Air Operations as needed, however, and he authorizes leave, signs time and attendance reports, does performance appraisals, and recommends subordinates for WGSIs. The court is persuaded that his primary duties are supervisory and executive.

Thomas Maxwell is a GS–13 SAP and PAIC of air operations in the Laredo Sector. His immediate supervisor is the Assistant CPA. He supervises five pilots, each of whom flies approximately four hours per day. Once they are on patrol, they are basically on their own. Maxwell averages two hours per day in the air himself, typically as a passenger.

Maxwell gives his pilots assignments and performs administrative duties, such as setting up schedules, allowing minor unscheduled leave, signing time and attendance sheets, and preparing performance work plans for his subordinates. In addition, he has authority to order a pilot to work overtime, to recommend a quality step increase or a bonus, or to tell a pilot in the field to do something or to stop doing something. When he is in the air he maintains radio contact with his pilots in the air and can direct their activities.

Although Maxwell minimized the supervisory character of his work during his testimony, the court views it differently. His primary function, even if he is not always performing it, is to give oversight as the first-line supervisor to the five pilots who report to him. Thus the fact that he may only spend twenty-five to thirty percent of his time directly engaged in supervisory or administrative duties, is not dispositive. *See Shockley*, 997 F.2d at 27; *Masters*, 800 F.Supp. at 366. These duties are substantial, particularly his role of directing the work of the pilots, and define the position. These functions are not episodic. He is in charge of his pilots' activities on a daily basis.

As PAIC, Maxwell also is the first-line supervisor to a supervisory aircraft mechanic, and a second-line supervisor to maintenance staff. He is, directly or in a second-line capacity, responsible for personnel matters for all those under him. The court finds that his position meets the primary duty test. He thus falls under the FLSA executive exemption.

Loren Nichols is the Deputy Chief of the Air Operations Center. As explained above, the Deputy Chief is the first-line supervisor of three Assistant Chiefs, including Lasher, who in turn are responsible for training, maintenance, acquisition and systems evaluation. The job involves preparing and reviewing performance work plans for subordinates, making recommendations for rewards and promotions, initiating disciplinary actions, and resolving employee grievances or referring them to higher authority. Nichols is

second in command of the entire unit. His PD states that he "supervises the Air Operations Center," "shar[es] fully in the direction of all phases of the program," and "[i]n the absence of the Chief, . . . assumes complete responsibility for all Air Operations Program functions." Def.'s Ex. 54 at 2. His discovery responses[18] indicate disagreement that his position currently relates to the Airlift Program but that disagreement does not draw into question the clear impression from Lasher's testimony and from Nichol's position description that supervisory functions predominate. The court thus has no reluctance in finding that the position fits within the executive function exemption.

Paul Beeson is an instructor at the Border Patrol Academy. He is a GS–13 SBPA, although his organizational title is Assistant Chief of the Border Patrol Academy. He did not testify at trial. Nevertheless, the court has before it his PD and his discovery responses. As explained in connection with consideration of whether he supervises a unit, the PD reveals that his functions are executive in nature. His interrogatory responses do not take issue with this description. Under the direction of the Chief of the Academy, he has day-to-day responsibility for supervising the training unit. He is the first-line supervisor of the Academy's permanent instructional staff and for supervisory agents detailed to the Academy as instructors. He plans and oversees the execution of the instructional program for both trainers and trainees. There was no evidence to counter the clear implication that his duties are virtually all supervisory. The Government has therefore met its burden of establishing that he is exempt.

## CONCLUSION

For the reasons stated above, we hold that defendant has met its burden of establishing that the following positions meet the execu-

tive exemption criteria, provided that a plaintiff occupying one of these positions supervised three or more non-support employees (prior to December 23, 1997)[19] or supervises two or more employees (since December 23, 1997):[20] Field Operations Supervisor or Watch Commander; Assistant Patrol Agent in Charge; Patrol Agent in Charge; Assistant Chief Patrol Agent; Deputy Chief Patrol Agent; Assistant Chief of the Border Patrol Academy; the Assistant and Deputy Chiefs of the Air Operations Center; and Patrol Agents in Charge of Air Operations. Persons occupying these positions who supervise the requisite number of employees are exempt, regardless of their GS pay grade. The remaining representative plaintiff SBPAs, who are first-line field supervisors of BPAs, are nonexempt and are entitled to overtime pay because they fail the "organizational unit" test.

The parties are directed to file a joint status report on or before October 29, 1999 proposing a means and a schedule for applying this ruling with respect to all plaintiffs and for determining back pay with respect to non-exempt employees.[21]

---

**18.** Plaintiffs objected to consideration of his discovery responses. That objection is rejected. *See supra* note 10.

**19.** *See* 5 C.F.R. § 551.204 (1997).

**20.** *See* 5 C.F.R. § 551.205 (1999).

**21.** Pending is defendant's motion for a protective order, in which it seeks to defer answering certain discovery requests, pending resolution of

liability questions. The motion in now moot, in light of this ruling, and so it is denied. The court agrees with the substance of the motion, however, and directs that remaining discovery be limited to those plaintiffs for whom overtime is due pursuant to this opinion. Defendant's obligation to answer runs from the date of this opinion.