MICHEL, Circuit Judge.
This suit was brought by certain present and former United States Border Patrol agents, alleging that the government wrongly and willfully failed to pay the plaintiffs overtime wages at a time-and-a-half rate as required by the Fair Labor Standards Act (“FLSA”), 29 U.S.C. § 207(a). The government conceded that the plaintiffs had not been paid for overtime, but contended that all of the various positions held by plaintiffs fell within the “executive exemption” to the FLSA’s overtime-pay requirements. See 29 U.S.C. § 213(a)(1) (1994)[1] (providing that FLSA’s overtime-pay requirements do not apply to “any employee employed in a bona fide executive, administrative, or professional capacity” (emphasis added)). After trial, however, the United States Court of Federal Claims determined that while some plaintiffs fell into the executive exemption, others did not and should have been paid for overtime at the FLSA rate. The Court of Federal Claims awarded damages to those plaintiffs as required by the FLSA. Plaintiffs-appellants now appeal several pre- and post-trial decisions by the Court of Federal Claims, some as to liability and others as to damages. We affirm.
BACKGROUND
The Court of Federal Claims extensively canvassed the established facts and the applicable law in a series of five opinions: Adams v. United States, 40 Fed. Cl. 303 (1998) {“Adams I”), Adams v. United States, 44 Fed. Cl. 772 (1999) {“Adams II ”), Adams v. United States, 46 Fed. Cl. 616 (2000) {“Adams III ”), Adams v. United States, 48 Fed. Cl. 602 (2001) {“Adams IV”), and Adams v. United States, 51 Fed. Cl. 57 (2001) {“Adams V”). Presuming familiarity with these opinions, we focus our discussion on the select factual and legal issues raised on appeal. To set the stage, however, we recite the post-trial findings of the Court of Federal Claims as to the general structure of the Border Patrol:
*1221 The Border Patrol is headquartered in Washington, D.C. Its function is to enforce the nation’s laws with respect to entry from foreign countries. The agency’s field structure is built around three geographic regions, each with a regional headquarters. None of the representative plaintiffs are employed at regional headquarters.
Collectively, the regions are divided into twenty one sectors, each with its own sector headquarters. Sector headquarters are under the control of a Chief Patrol Agent (“CPA”). Immediately below the CPA is the Deputy CPA, followed by one or more Assistant CPAs.
Each sector encompasses a number of border patrol stations. Stations are headed by Patrol Agent in Charge (“PAIC”), who typically reports to one of the Assistant CPAs. Structure in the different sectors and stations varies to some extent, primarily dependent on size, but in most stations there are also one or more Assistant Patrol Agents in Charge (“APAICs”). In the larger stations, the field position below the APA-IC is that of Field Operations Supervisor (“FOS”) sometimes referred to as a “Watch Commander.” Below the FOSs (there is typically more than one FOS in a station) is the position of SBPA [Supervisory Border Patrol Agent]. The SBPAs, in turn, supervise the BPAs [Border Patrol Agents].
Although the organization of each station is to some extent unique, the supervisory pyramid described by Sherry Feltner, PAIC at Temicula Station in southern California, is a useful paradigm. She referred to herself as a fourth-line supervisor (of BPAs). Below her is the APAIC, who is a third-line supervisor. Below the APAIC are three FOSs. Below the FOSs are fifteen SBPAs, who are the first-line supervisors of the approximately 125 BPAs.
Depending on the size of the sector or station within which an agent works, a particular position can appear at a number of GS pay levels. For example, in the larger stations, the PAIC is typically a GS-14. In the smaller stations, the PAIC can be GS-13 or even a GS-12. In some positions, there is considerably less variance. FOSs are typically at a GS-13 level; SBPAs are generally graded either GS-11 or GS-12.
Adams II, 44 Fed. Cl. at 774.
DISCUSSION
We have jurisdiction over this timely appeal from the final judgment of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3). In reviewing decisions of the Court of Federal Claims, we apply a de novo standard to legal conclusions, see, e.g., Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir.2001), and a clear-error standard to factual findings, e.g., id. We first address plaintiffs’ arguments on liability, and then turn to their arguments on damages.
I.
Liability in this case turned on the application of the executive-exemption standard in force during the relevant time period. For most federal employees — including the Border Patrol — the FLSA’s executive exemption is interpreted by the Office of Personnel Management (“OPM”). See 29 U.S.C. § 204(f) (1994) (authorizing OPM to supervise the application of the FLSA for most federal employees). During the period at issue, an OPM regulation defined an “executive” employee as a
supervisor, foreman, or manager who manages a Federal agency or any subdivision thereof (including the lowest recognized organization [sic] unit with a continuing function) and regularly and *1222 customarily directs the work of at least three subordinate employees (excluding support employees) and meets all the following criteria:
(a) The employee’s primary duty consists of management or supervision. The primary duty requirement is met if the employee—
(1) Has authority to select or remove, and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and
(2) Customarily and regularly exercises discretion and independent judgment in such activities as work planning and organization; work assignment, direction, review, and evaluation; and other aspects of management of subordinates, including personnel administration.
5 C.F.R. § 551.204 (1997).[2]
The Court of Federal Claims determined that as to most of the Border Patrol positions at issue, the government had met its burden of proving the positions met the OPM’s executive-exemption standard and were thus exempt from the FLSA’s overtime-pay requirements. Adams II, 44 Fed. Cl. at 785. The Court of Federal Claims determined, however, that the government did not prove the applicability of the executive exemption to certain positions. Id. A notable example was the group of Supervisory Border Patrol Agents (“SBPAs”) serving as first-line supervisors of Border Patrol Agents (“BPAs”); the Court of Federal Claims determined that these SPBAs were “nonexempt and are entitled to overtime pay because they fail the ‘organizational unit’ test.” Id.
Plaintiffs make three arguments on liability: (A) the Court of Federal Claims erred by not construing a pre-trial stipulation between the parties as a requirement that Border Patrol positions with the same classification and grade be treated the same under the executive-exemption standard; (B) the Court of Federal Claims clearly erred in determining that the Border Patrol’s GS-13 Field Operations Supervisors supervised a recognized organizational unit; and (C) the Court of Federal Claims erred by not holding the OPM’s executive-exemption standard invalid for conflict with the analogous standard for private employees set forth in a regulation promulgated by the Department of Labor. We address each argument in turn.
A.
Before trial, the parties agreed to a stipulation to limit the trial to certain representative plaintiffs “who the parties agree[d], as a whole, represent[ed] the various [Border Patrol] positions, the exemption status of which are at issue.” The stipulation listed eight positional classifications, including “Supervisory Border Patrol Agent (GS-11),” “Supervisory Border Patrol Agent (GS-12),” “Supervisory Border Patrol Agent (GS-13),” and “Supervisory Border Patrol Agent (GS-14).”
After trial, the Court of Federal Claims found that even among agents who had the classification of SBPA and the same grade level, “agents h[e]ld a wide variety of positions, which [we]re identified by specific organizational titles on an agent’s position description.” Adams II, 44 Fed. Cl. at 774. For example, plaintiff Paul Beeson was *1223 graded and classified as a GS-13 SBPA, but his organizational title was “Assistant Chief of the Border Patrol Academy.” Id. at 785. Unlike the SBPAs serving as first-line supervisors of BPAs, the Court of Federal Claims determined that Beeson did supervise a recognized organizational unit, namely, the Border Patrol Academy’s instructional staff. Id. at 779 (stating that “the instructional staff constitute^ an organizational unit, and [Beeson’s] supervisory role [wa]s exercised with respect to that unit, and in an executive capacity”).
Notwithstanding the variation of duties specified in the job descriptions of the various SBPAs,
[i]n post-trial briefing, plaintiffs took the position that [because of the parties’ pre-trial stipulation] rulings as to representative plaintiffs controlled similarly graded and classified positions, irrespective of whether a plaintiffs particular job title and description might be completely different. For example, plaintiffs contend that two previously designated representative plaintiffs, Paul Beeson and Loren Nichols, should benefit from whatever ruling the court makes as to GS-13 or GS-14 Supervisory Border Patrol Agents, despite the facts that these two men elected not to testify and that them positions are completely different from those of other plaintiffs of similar grade.
Id. at 773. The Court of Federal Claims rejected plaintiffs’ argument, stating: “The court cannot construe the stipulation in a way that is inconsistent with law or reason. It will rule on all representative plaintiffs and expects the parties to apply these rulings consistently to all similarly graded positions with the same organizational job titles.” Id.
The Court of Federal Claims did not err by so construing the stipulation. Nothing stated or necessarily implied in the stipulation required the Court of Federal Claims to turn a blind eye to the facts proven about differences in duties of employees with the same grade and classification. The stipulation did not require the Court of Federal Claims to treat every plaintiff in the same fashion as every other plaintiff with a similar grade and classification, despite meaningful differences in official positional responsibilities.
B.
As discussed above, liability turned on the application of the OPM executive-exemption regulation, which required, inter alia, that executives “manage[ ] a Federal agency or any subdivision thereof (including the lowest recognized organization [sic] unit with a continuing function).” 5 C.F.R. § 551.204 (1997) (emphasis added). In interpreting the meaning of “recognized organization unit,” the Court of Federal Claims drew guidance from an advisory letter issued by the OPM in 1975, which defined a recognized organizational unit as
[a]n established and defined organizational entity with regularly assigned employees. This requirement distinguishes supervisors who are responsible for planning and accomplishing a continuing workload from “leaders” who head temporary groups formed to perform a special assignment of limited duration, or who direct the work of other employees assigned to a project but do not exercise full supervision over such employees. Leaders of this nature do not qualify for exemption as executive employees.
OPM Letter 551-7 § B(l)(b) (1975). Though this letter was apparently not in effect during most of the relevant time period, the Court of Federal Claims concluded that it “captured the relevant standard,” Adams III, 46 Fed. Cl. at 618, particularly given the later codification of the letter’s core language at 5 C.F.R. *1224 § 551.104 (1999); plaintiffs do not contest this conclusion.
Applying this standard, the Court of Federal Claims determined that a Border Patrol “shift” was a recognized organizational unit, and found that the Border Patrol’s Field Operations Supervisors (“FOSs”) supervised these shifts:
Work in the field is typically organized around one of the three eight-hour shifts. Each shift is under the direction of one or more FOSs or Watch Commanders. They share responsibility for the entire shift. Typically, each shift also has several SBPAs....
Shifts typically are established on a six-monthly or annual basis, and, with minor exceptions, continue intact until the end of that period with the same supervisors and agents. A particular shift can be referred to readily enough for administrative purposes, as for example, the “midnight to eight a.m. shift.” In the Yuma, Arizona Station, the three shifts are given alphabetical designations. Moreover, two FOSs, Joseph Rayball Jr. and Robert Argento, a Government witness, identified the shift as the lowest organizational unit within a station. See Tr. at 832, 1009-10. In addition, the shift has a continuing function, namely, carrying out border patrol functions in the geographic area assigned to a station during a set period of time.
For those station[s] with FOSs, typically three are employed, one per shift. Each is responsible for the scheduling and administrative duties for their shift. At the largest stations, where there are more than three FOSs at a station, there are occasions when more than one FOS works on a shift. In these circumstances, either one FOS may supervise the line units and one supervises special operations, or field command of the shift may be shared by the FOSs. In addition, the FOSs share scheduling duties. For rating purposes, however, they are each assigned specific SBPAs.... [Rotation of the FOSs within the shift does not alter the continued existence and identity and function of the shift as a unit. Although a different FOS may be in charge in the field on Monday than on Tuesday, those two FOSs are still supervising the same unit of agents.
The court concludes that FOSs supervise a recognized organizational unit. Cf, e.g., West [v. Anne Arundel County, 137 F.3d [752,] 763 [(4th Cir.1998) ] (holding that a shift is a recognized unit of a fire department); Masters [v. City of Huntington], 800 F.Supp. 363,] 364-65 [ (S.D.W.Va.1992) ]; International Ass’n of Fire Fighters v. City of Alexandria, 720 F.Supp. 1230, 1233 (E.D.Va. 1989), aff'd, 912 F.2d 463 (4th Cir.1990) (table).
Adams II, 44 Fed. Cl. at 777-79 (emphasis in original).
Plaintiffs assert that the Court of Federal Claims ignored evidence that the FOSs did not supervise the same SBPAs on a continuing basis; plaintiffs point out that an FOS might have had administrative responsibility over certain members of the shift, but not exercised continuous supervision over these members because of FOS rotation. Plaintiffs contend that the FOSs are best viewed as leaders of “temporary groups to perform a special assignment of limited duration,” not supervisors of a recognized organizational unit.
But the Court of Federal Claims did not ignore or misjudge the evidence to which plaintiffs point: To the contrary, the Court of Federal Claims determined that “rotation of the FOSs within the shift d[id] not alter the continued existence and identity and function of the shift as a unit” and did not undermine the FOSs’ supervision over *1225 the shift. Id. at 779 (emphasis in original). These determinations, we hold, are consistent with the regulatory framework. The recognized-organizational-unit test can be broken down into two subtests: (1) whether there is a recognized organizational unit, i.e., an established and defined organizational entity with regularly assigned employees, and if so, (2) whether the purported executive manages or supervises the recognized organizational unit. The rotation of FOSs within the shift is irrelevant to the first subtest, and if it is relevant at all to the second subtest, it is only weakly so: A person can function as a manager or supervisor, even if his or her responsibilities are shared with other such leaders, and even if this sharing means that a particular manager’s or supervisor’s duties with respect to certain of the managed or supervised employees will vary from day to day. Nothing in the OPM executive-exemption regulation expressly required that a manager or supervisor perform precisely the same tasks, and oversee precisely the same people in the unit, every day, to qualify under the executive exemption. See 5 C.F.R. § 551.204 (1997).
Here, the Court of Federal Claims determined that a shift was a recognized organizational unit, and further determined that FOSs supervised the shift. To the extent the Court of Federal Claims was interpreting the OPM regulation, we agree with this interpretation. To the extent the Court of Federal Claims was finding facts, plaintiffs have failed to show clear error — to the contrary, extensive evidence supported such findings. See Adams II, 44 Fed. Cl. at 777-79.
C.
Plaintiffs’ argument that the OPM regulation was invalid for conflict with the analogous Department of Labor regulation for private employees was rejected in Billings v. United States, 322 F.3d 1328 (Fed. Cir.2003).[3] We cannot revisit this issue, except en banc. See Newell Cos., Inc. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir.1988) (“This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc.”). We see no reason to seek an en banc review of this appeal under Rule 35 of the Federal Rules of Appellate Procedure and our court’s rules.
II.
In the damages phase, the Court of Federal Claims awarded the unpaid overtime to all prevailing plaintiffs, and also awarded liquidated damages, but only to three plaintiffs; the Court of Federal Claims did not award prejudgment interest to any of the plaintiffs. Plaintiffs make three arguments on damages: (A) the decision of the Court of Federal Claims not to award liquidated damages to most of the prevailing plaintiffs was based on the clearly errone *1226 ous determination that the government acted in good faith as to these plaintiffs; (B) the decision of the Court of Federal Claims to apply a two-year — as opposed to a three-year — statute of limitations to most of the prevailing plaintiffs’ claims was based on the clearly erroneous determination that the government did not willfully violate the FLSA as to these plaintiffs; and (C) the Court of Federal Claims erred by not awarding interest under the Back Pay Act to the prevailing plaintiffs. We address each argument in turn.
A.
29 U.S.C. § 216 provides for FLSA damages in the form of “unpaid overtime compensation ... [and] an additional equal amount as liquidated damages,” but 29 U.S.C. § 260 states that “if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.” The burden rests on the government to establish its good faith and the reasonable grounds for its decision.[4] See § 260.
In this case, the Court of Federal Claims determined that the government proved that its categorization of SBPAs serving as first-line supervisors of BP As as exempt from FLSA overtime requirements — despite, in the judgment of the Court of Federal Claims, that these SBPAs were not supervising a recognized organizational unit — was made in good faith. Based on this determination, the Court of Federal Claims declined to award these SPBAs liquidated damages.[5]
In deciding that the government had shown good faith, the Court of Federal Claims relied on the deposition testimony of Eulalia Robinson, “a personnel specialist at the Immigration and Naturalization Service (the Border Patrol’s parent organization),” whom the government offered as a witness to the original classification — in approximately 1980 — of the SBPAs as exempt from the FLSA overtime requirements. Adams III, 46 Fed. Cl. at 619. The Court of Federal Claims also considered the uncertainty of the proper classification:
It is not surprising ... that the classifiers would treat the SPBA and the BPA’s assigned to him for administrative purposes as a unit. Within the terms of the 1975 OPM letter, the BPAs were “regularly assigned.” In a “top down” bureaucratic sense, a classifier might consider this “team” an organizational unit for FLSA purposes. It is the entity from which personnel paperwork winds its way up the chain of command. *1227 At a minimum, this was a close question for the court. The Court of Federal Claims in Beebe v. United States, 226 Ct.Cl. 308, 328, 640 F.2d 1283, 1295 (1981), held that it is relevant to the “reasonable grounds” inquiry under Section 260 that the question is “uncertain, ambiguous, or complex.” There is no question that application of the organization unit test was uncertain in the present circumstances.
Adams III, 46 Fed. Cl. at 620-21.
Plaintiffs do not dispute the uncertainty of the classification issue, instead focusing their challenge on Robinson’s testimony. As a threshold matter, plaintiffs question whether Robinson was even involved in the original classification decision, and characterize her testimony as mere speculation. This characterization is based on a fragment of Robinson’s testimony:
Q: Were you involved in the original decision to exempt the supervisors?
A: I would have been to some extent.
Plaintiffs contend that the use of the conditional “would” implies uncertainty as to whether Robinson actually participated in the classification process. But plaintiffs ignore other, more definitive testimony given by Robinson:
Q: Did you make some determinations concerning border patrol supervisors as to whether they are exempt or not?
A: Yes. We have sometime back.
Moreover, plaintiffs neither offered at trial nor now point to any record evidence showing Robinson was not involved in the decision-making process.
Plaintiffs argue that even if Robinson was involved in the classification process, her testimony demonstrated that she did not apply all of the OPM’s executive-exemption standard, and in particular failed to apply the recognized-organizational-unit test. Robinson described the executive-exemption standard as follows:
Q: And when you analyzed that, what factors did you consider in exempting them?
A: The factors considered would have been whether they met the test in the law, which means that they supervise a minimum of three subordinate employees—
Q: Is that the only — I’m sorry. I interrupted you. I can tell.
A: And they are responsible for directing and — directing the work to be accomplished, holding the subordinates accountable for the work accomplished, evaluating how well they’ve accomplished such work.
Q: Are you done?
A: Yes.
Q: Explain to me what you believe to be the executive exemption.
A: The executive exemption applies to supervisors within the — supervisors and managers.
Q: You understand in the Fair Labor Standards Act that there’s elements of the executive exemption. Are you familiar with those?
In other words, you have to — you have to fill a position that meets certain criteria to be exempt under executive. Are you familiar with that?
A: Yes.
Q: And you found that they met all of those criteria?
A: Yes.
Q: And what were those criteria, other than they supervised more than three people?
A: They direct the work to be accomplished, they hold the subordinates ac *1228 countable for the work being performed and they evaluate the work that’s being done — that’s been done.
Robinson testified that she applied the executive-exemption standard to the Border Patrol employees’ documentary positional descriptions. Robinson was not asked about the recognized-organizational-unit test.
We conclude that Robinson’s testimony was sufficient to satisfy the government’s burden on good faith, in the absence of effective counter-evidence from the plaintiffs. Robinson described core elements of the executive-exemption standard, and a logical approach for applying the standard (ie., analyzing documentary positional descriptions). While Robinson did not expressly mention the recognized-organizational-unit test, this test is simply an aspect of the terms “supervisor” and “manager” as used in the regulation — and Robinson did expressly state that “[t]he executive exemption applies to ... supervisors and managers.” See also 5 C.F.R. § 551.204 (1997) (stating in the first sentence that the regulation is limited to “supervisor[s], forem[e]n, or manager[s] who manage[ ] a Federal agency or any subdivision thereof (including the lowest recognized organization unit with a continuing function)”). Moreover, “a presumption of regularity attaches to the actions of Government agencies,” United States Postal Service v. Gregory, 534 U.S. 1, 10, 122 5. Ct. 431, 151 L.Ed.2d 323 (2001), and it can therefore be presumed that Robinson used the terms “supervisor” and “manager” in a manner consistent with the regular application of the regulation.[6] Finally, as the Court of Federal Claims observed, “the factors she did cite (number of employees, primary duty test) are clearly set out in the rule. The organization unit test appears as a parenthetical in the introduction rather than a listed criteria.” Adams III, 46 Fed. Cl. at 621. At bottom, plaintiffs read too much into Robinson’s failure to recite a single element of the regulation, where she was never specifically asked about this element.
The plaintiffs do not provide effective counter-evidence on good faith. If plaintiffs wanted to demonstrate Robinson’s failure to apply the recognized-organizational-unit test, plaintiffs should have questioned her about it. Compare Angelo v. United States, 57 Fed. Cl. 100, 106 (2003) (noting that plaintiffs “specifically asked if [Robinson] had considered whether [plaintiffs] supervised or managed a recognized organizational unit with a continuing function”). Beyond their unpersuasive critique of Robinson’s testimony, the only other evidence that plaintiffs point to as demonstrating lack of good faith is the trial testimony of certain Border Patrol witnesses describing the rotation of FOSs among various supervisory duties in a given shift. According to plaintiffs, this was “the most telling evidence of the [Border Patrol’s] willfulness and bad faith,” as it showed “knowledge and intent ... to have supervisors assigned in a fashion that could not be remotely described as supervising a recognized organizational unit.” But the Court of Federal Claims determined that “rotation of the FOSs within the shift d[id] not alter the continued existence and identity and function of the shift as a unit” and did not undermine the FOSs’ supervision over the shift. Adams II, 44 Fed. Cl. at 779. Given these determinations — which, as discussed above, we affirm — the Border Pa *1229 trol witnesses’ testimony did not demonstrate any error in classification, let alone one so egregious it cast doubt on the government’s good faith in making the classification. In short, the findings of the Court of Federal Claims on the government’s good faith have not been shown to be clear error, nor has any error of law been shown.
B.
The statute of limitations for FLSA violations is two years, “except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.” 29 U.S.C. § 255 (1994). Unlike good faith, the employee bears the burden of proving the willfulness of the employer’s FLSA violations. See, e.g., Bankston v. Illinois, 60 F.3d 1249, 1253 (7th Cir.1995) (“[T]he plaintiffs bore the burden of showing that the defendants’ conduct was willful for purposes of the statute of limitations.”). The standard for willfulness is that the “the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.” McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).
The trial court determined that the plaintiffs failed to carry their burden on willfulness. Adams III, 46 Fed. Cl. at 621-22. Plaintiffs contest this determination, relying on the same evidence they did as to good faith, i.e., Robinson’s testimony on the classification process and the Border Patrol witnesses’ testimony on FOS rotation within a shift. But Robinson’s testimony did not demonstrate willfulness, and the testimony of the Border Patrol witnesses on FOS rotation did not support any violation of the FLSA and a fortiori did not support a willful violation. The findings of the Court of Federal Claims on willfulness have not been shown to be clear error, nor has any error of law been shown.
C.
The final issue is the availability of prejudgment interest on the overtime pay awarded to certain plaintiffs. Because of the federal government’s sovereign immunity, “[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.” Library of Cong, v. Shaw, 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). We have held that “[t]he FLSA does not waive immunity for suits against the Government for interest.” Doyle v. United States, 931 F.2d 1546, 1551 (Fed.Cir.1991); see also Zumerling v. Marsh, 783 F.2d 1032, 1033 (Fed.Cir.1986) (stating that “the United States has not waived its sovereign immunity with respect to an award of post-judgment interest in FLSA cases”).
Plaintiffs assert that prejudgment interest on overtime back pay is nevertheless available, but under the Back Pay Act (“BPA”), 5 U.S.C. § 5596. The BPA provides remedies — including interest — for violations of pay-entitling statutes. See id. The Court of Federal Claims engaged in a lengthy analysis of the potential interaction of the BPA and the FLSA, and concluded that the plaintiffs could not rely on the BPA for prejudgment interest because “the plaintiffs ha[d] already invoked an integrated remedy, in the form of the FLSA.” Adams IV, 48 Fed. Cl. at 610. The Court of Federal Claims observed that courts have held that “liquidated damages under the FLSA serve the purpose of interest, and, thus, the recovery of both is not allowed.” Id. The Court of Federal Claims concluded that if the BPA’s interest provision were applicable to a damages *1230 award under the FLSA, “liquidated damages would be read out of the FLSA ... [a] result [that] is so at odds with the FLSA remedy Congress created that we could not adopt it unless the waiver were plain.” Id. at 611.
Whether liquidated damages under the FLSA and interest under the BPA are mutually exclusive is an issue that would require close analysis, if we had to decide it here — but we do not. Plaintiffs conceded at oral argument that their complaint did not include a claim under the BPA. In light of this concession, plaintiffs necessarily argue that FLSA plaintiffs can always invoke BPA remedies, whether the BPA is pleaded or not. We do not agree: If plaintiffs desired BPA remedies, they should have included a BPA claim. In fact, their complaint rested solely on the FLSA, which “authorized payment of liquidated damages, not interest.” Doyle, 931 F.2d at 1550; see also Ameson v. Callahan, 128 F.3d 1243, 1245-47 (8th Cir. 1997) (holding plaintiffs could not rely on the BPA to obtain interest on a back pay award under the Rehabilitation Act of 1973 where the suit was brought under the Rehabilitation Act, not the BPA).
We therefore need not and do not reach the issue of whether a plaintiff can prevail on both a well-pleaded BPA claim for interest and an FLSA claim for liquidated damages arising out of the same facts.
CONCLUSION
For the foregoing reasons, we uphold all of the challenged decisions of the Court of Federal Claims.

AFFIRMED.

. Throughout this opinion, we cite to the statutes in force when this suit was filed in 1996.

. This OPM regulation was later revised and renumbered as 5 C.F.R. § 551.205 (1999). See Adams II, 44 Fed. Cl. at 775 n. 5 (describ-mg differences between the two regulations). The differences between the two regulations have no impact on the issues on appeal.

. As noted above, before the trial in the instant suit, the parties agreed to use certain plaintiffs as representatives for the entire list of plaintiffs on the complaint. After the trial, the parties discovered that certain named plaintiffs' positions had not been represented at trial. The Court of Federal Claims severed these class members into a separate suit captioned Bates v. United States. In Bates, the government obtained summary judgment that the position of Assistant Chief Patrol Agent at the United States Border Patrol Academy met the OPM executive-exemption standard. Bates v. United States, 51 Fed. Cl. 460, 461-64 (2002). The unsuccessful Bates plaintiffs appealed to our court, which captioned the appeal Billings v. United States. We rejected the Billings appellants' argument that the OPM executive-exemption standard was invalid because it conflicted with the Department of Labor's executive-exemption standard for private employees, and affirmed the Court of Federal Claims. Billings, 322 F.3d at 1334-35.

. Here, the government points to the same evidence to show its good faith and the reasonable grounds for its decision. For simplicity, the balance of our discussion will refer simply to good faith.

. The Court of Federal Claims did award liquidated damages to three plaintiffs, none of whom supervised the requisite number of employees to qualify under the OPM executive-exemption regulation. See 5 C.F.R. § 551.204 (1997) (requiring that an executive “regularly and customarily direct[ ] the work of at least three subordinate employees (excluding support employees)”); Adams III, 46 Fed. Cl. at 621-22. The Court of Federal Claims also determined that the government had willfully violated the FLSA as to these three plaintiffs, and therefore applied a statute of limitations of three years, not two. See 29 U.S.C. § 255 (1994) (providing that the statute of limitations for willful FLSA violations is three years); Adams III, 46 Fed. Cl. at 621-22.

. We do not suggest that the presumption of regularity eliminates the government's statutory burden on good faith. Under 29 U.S.C. § 260, the government carries this burden, and it must provide actual evidence to satisfy it; the government cannot simply rest on the presumption of regularity to satisfy the burden.